## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:20-cv-23402

| | |
|---|---|
| PINNACLE THREE CORPORATION, and LEON GOLDSTEIN,<br><br>    Plaintiffs,<br><br>v.<br><br>OLEG FIRER, IGOR "GARY" GELMAN, and STAR EQUITIES, LLC<br><br>    Defendants. | **1.** Violation of the Securities Exchange Act of 1934 15 U.S.C. § 78j(b); Rule 10b-5; 17 C.F.R. § 240.10b-5;<br>**2.** Liability of Controlling Persons, 15 U.S.C. § 78t;<br>**3.** Violation of the Florida's Securities Investor Protection Act, Fla. Stat. § 517.011 *et seq*.;<br>**4.** Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.203 *et seq*.;<br>**5.** Fraudulent Misrepresentation. |

### COMPLAINT

Plaintiffs LEON GOLDSTEIN and PINNACLE THREE CORPORATION sue Defendants OLEG FIRER, IGOR "GARY" GELMAN, and STAR EQUITIES, LLC.

### INTRODUCTION

1.      Defendants ran and continue to run an illicit fundraising and money management scheme in violation of the Federal and State securities laws, a scheme by which they misled Plaintiffs into purchasing unregistered non-exempt securities in Star Development Limited, a Grenadian company formed on July 3, 2017 ("Star Development Ltd"), by lying in the operating agreement about the amounts of Defendants Oleg Firer and Igor "Gary" Gelman's capital contributions into the Star Development Ltd and/or by misrepresenting and/or misattributing other investors' capital contributions as their own, and by lying about the amounts of total contribution of capital into Star Development Ltd. The shares in the Star Development Ltd sold to Plaintiff Goldstein as nominee for Plaintiff Pinnacle Three Corporation constituted investment contracts and therefore securities. Defendants groomed Plaintiffs into investment under false promises of

sky-high returns coupled with the misrepresentations about the amounts Defendants Firer and Gelman invested into the Star Development Ltd. The purpose of these misrepresentations was to induce Plaintiff Pinnacle Three Corporation to entrust its funds, with Mr. Goldstein as the designated nominee, in the form of initial capital contributions into the Star Development Ltd.[1] However, unencumbered by the risk of loss of their own monies, *i.e.* their own capital contributions into the Star Development Ltd, Defendants Gelman and Firer were de facto unlicensed brokers of securities working without registration and regulatory supervision of the Florida Office of Financial Regulation, Division of Securities, Securities and Exchange Commission, and/or Financial Industry Regulatory Authority Inc..

## PARTIES

2.     Plaintiff LEON GOLDSTEIN is an individual residing in Florida.

3.     Plaintiff PINNACLE THREE CORPORATION is a Florida corporation with its principal place of business in Miami-Dade County. Mr. Goldstein is the current corporate secretary of Pinnacle Three Corporation. However, during the year 2017, Defendant Firer was a corporate secretary of Pinnacle Three Corporation.

4.     Defendant OLEG FIRER is an individual residing and doing business within this District.

5.     Defendant IGOR "GARY" GELMAN is an individual residing and doing business within this District.

6.     Defendant STAR EQUITIES LLC is a Florida limited liability company doing

---

[1] Defendants peddled and sold, in Florida, securities to other descendants from Ukraine and Russia – all under a clout of Oleg Firer's Grenadian ambassadorship to Russia. One such duped investor currently sues Firer, Gelman, and the companies controlled by the two, as part of action filed in this District and titled *Linco Enterprises Inc. v. Firer et al.,* Case No. 1:20-cv-22234-JEM.

business within this District.

7.     On all occasions as alleged herein, when Defendants Firer and Gelman communicated with Plaintiffs by phone, in person, and/or via internet, concerning the sale of 20% interest in Star Development Ltd, Defendants Gelman and Firer jointly and severally acknowledged that they act as each other's agents, and as agents for Star Development Ltd company.

## JURISDICTION AND VENUE

8.     Section 78aa of the Securities Exchange Act of 1934 grant this Court jurisdiction over claims asserted in Counts I and II. Additionally, pursuant to section 78aa, venue is properly laid in this District, because the Defendants are found or are an inhabitant or transact business in the Southern District of Florida. The Court's pendent jurisdiction over state law claims is invoked under section 1367 of Title 28, since the state claims form part of the same controversy.

## BACKGROUND ALLEGATIONS

9.     In the wake of Oleg Firer's appointment by the Grenadian government as Grenada's Ambassador to Russia, Defendant Firer together with his sidekick Defendant Gelman scavenged Moscow, Miami, and Odessa for investors into "Project Boeuf," supposedly for a development of a small hotel under Hilton's Curio™ brand, on a 3.67 acre parcel located on Parc a Boeuf in the St. George Parish, Grenada.  Defendants Firer and Gelman touted that "Project Boeuf" was imminent to receive a license for Grenada's Citizenship by Investment Program, the fundraised monies from which were to be used in furtherance of the land improvement.

10.     In the last 7-10 days of the month of November 2017, Defendants Gelman and Firer approached Pinnacle Three Corporation represented through Mr. Goldstein in person and made multiple phone calls representing to Plaintiff Goldstein, as the nominee for Pinnacle Three

Corporation, that Defendants Firer and Gelman have identified for purchase at a foreclosure sale through Star Development Ltd a real estate parcel that had a price of $4,200,000.00 and located in Parc a Boeuf in the St. George Parish, Grenada. As purported by Firer and Gelman to Plaintiffs, Star Development Ltd members' $840,000.00 contributions are critical to purchase the realty to run Project Boeuf.  At that time in November 2017, Mr. Goldstein knew Defendants Firer and Gelman for at least 10 years, had business affairs with them previously, and generally trusted them. At that same time in November 2017, Defendant Firer was a corporate secretary of Pinnacle Three Corporation and owed it a fiduciary duty of loyalty.

11.     On December 5, 2017, at or about noon, Plaintiff Goldstein met with Defendant Gelman in the lobby of the Pinnacle building at 17555 Collins Avenue in Sunny Isles Beach – a date, time, and location agreed upon and set by Gelman and Firer. In advance of this meeting, Gelman and Firer sent via internet certain pictures to Plaintiffs with renderings and depictions of the Project Boeuf. As previously instructed by Firer and Gelman, Plaintiff Goldstein had with him a check made out by and from the account of Pinnacle Three Corporation in the amount of $840,000.00 and written to Star Equities LLC, a company controlled by Gelman and Firer. Defendant Gelman brought with him "Limited Liability Company Operating Agreement for Star Development Limited, a Limited Liability Company" a true and accurate copy of which is attached hereto as **Exhibit 1** (hereinafter, "Star Development Ltd Operating Agreement"). At the afore-mentioned date, time, and place, when the Star Development Ltd Operating Agreement was offered for signature to Plaintiffs, and unbeknown to Mr. Goldstein and Pinnacle Three Corporation, it contained untrue statements of material fact, purporting Gelman's capital contribution of $840,000.00 and Firer's capital contribution of $840,000.00, while in reality neither of them have contributed any such amounts. At the afore-mentioned date, time, and place

on December 5, 2017, Defendant Gelman, on behalf of himself Firer and Star Equities, reiterated to Plaintiffs that the $4,200,000.00 investment into the realty for the Project Boeuf was necessary with all five shareholders contributing an equal $840,000.00 amount for a 20% stake each. These misrepresentations were continuing in nature, because neither Defendant ever corrected them. In reliance on these misrepresentations, Plaintiff Pinnacle Three Corporation with Plaintiff Goldstein as nominee purchased 20% interest in Star Development Ltd from Defendant Star Equities in exchange for $840,000.00 paid to Star Equities by way of a check written from the account of Pinnacle Three Corporation. Only in mid-April 2020, Plaintiffs independently learned that Defendants Gelman and Firer's capital contributions as purported to Plaintiffs were false, in that neither of them contributed the $840,000.00 amount.

12.     Subsequently, about June 2020, Plaintiffs discovered that on January 19, 2018, Star Development Ltd acquired the realty in Parc a Boeuf, Grenada, yet not for $4,200,000.00 as purported by Firer and Gelman, but for $1,450,000.00.  Also in June 2020, Plaintiffs discovered that Defendants signed a different operating agreement for Star Development Ltd, and according to "Exhibit II" to the operating agreement of Star Development Ltd signed by Gelman and Firer on or about December 30, 2017, Firer and Gelman contributed $1,000.00. The total of contributions was $1,684,000.00 and not $4,200,000.00 as falsely purported to Plaintiffs by the Defendants. A true and accurate copy of "Exhibit II" dated December 30, 2017 is attached as **Exhibit 2**. Plaintiffs later learned that Firer and Gelman in fact contributed nothing in actual cash capital into the Star Development Ltd and zero dollars toward the purchase of the Parc a Boeuf a/k/a Grooms Beach realty.

13.     Accordingly, while only on May 24, 2018 the Parc a Boeuf a/k/a Grooms Beach was officially recorded with the Deeds and Land Registry of Grenada, back on December 5, 2017

– when Plaintiff Pinnacle Three Corporation and Mr. Goldstein as its nominee, purchased the purported 20% interest in Star Development Ltd for $840,000.00 – the real market value of Plaintiffs' interest in Star Development Ltd was zero because no adjustments in the register of the Star Development Ltd was made to reflect the purchase and no shares certificates were ever issued and/or transferred to either Plaintiff.

14.     At all relevant times, Defendants have made representations, acknowledged, and/or manifested to Plaintiff that they are each other's agents and have acted within the scope of their respective duties when made representations and misrepresentations as alleged herein. The $840,000.00 payment made to Star Equities was as a result of Plaintiffs' reasonable belief in truthfulness of Defendants' representations and/or manifestations that they are and were each other's agents, and said payment reflected Plaintiffs' change in position.

15.     Plaintiffs retained the undersigned counsel and have obligated themselves to pay reasonable attorney's fees and costs in prosecution of this action.

**COUNT I: VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**
**15 U.S.C. § 78j(b); RULE 10b-5; 17 C.F.R. § 240.10b-5**
**[STAR EQUITIES]**

16.     Plaintiffs restate the allegations in paragraphs 1 through 14 entirely.

17.     On December 5, 2017, at the time and location as more particularly alleged above, Defendant Star Equities sold to Plaintiff Pinnacle Three Corporation with Plaintiff Goldstein as nominee an investment in a commercial and/or financial business enterprise with the expectation that profits or other gain will be produced by others. The units and/or shares in Star Development Ltd constitute a security.

18.     Defendant Star Equities sold investments using instrumentalities of interstate commerce, such as mails, telephone, Internet, and/or other form of electronic communication, in

connection with the sale of the securities.

19.     Defendant Star Equities employed a device, scheme, or artifice to defraud – alleged in paragraphs 1-14 – in connection with the purchase or sale of a security.

Alternatively, Defendant made a misrepresentation of a material fact, or omitted a material fact – alleged in paragraphs 1-14 – in connection with the purchase or sale of a security.

Alternatively, Defendant engaged in an act, practice, or course of business – as alleged in paragraphs 1-14 in connection with the purchase or sale of a security – that operated or would operate as a fraud or deceit on any person.

20.     Neither on the date and at the time of signing Exhibit 1 nor at any time thereafter, Defendant Star Equities or its agents Firer and Gelman ever disclosed to Plaintiffs that the dollar amounts, purporting to reflect capital contribution by Defendants Gelman and Firer on the schedule of capital contributions in the Star Development Ltd, were false.  While "on paper" Plaintiffs Pinnacle Three Corporation with Mr. Goldstein as nominee for $840,000.00 was purchasing 20% of a $4,200,000.00 asset, in reality it was not so, and Defendants omitted disclosure of these material facts to Plaintiffs.

21.     Had Plaintiffs known of Defendant's misstatements as to capital contributions and/or omission of truth regarding capital contributions and the cost of Parc a Boeuf a/k/a Grooms Beach land parcel, and had Plaintiff known that Defendant Star Equities could not lawfully sell non-exempt securities in Star Development Ltd to Plaintiffs without prior registration, Plaintiffs would not have purchased the securities. Put another way, a reasonable investor, like Plaintiff Goldstein or Plaintiff Pinnacle Three Corporation, would view the misstated or omitted fact's disclosure as significantly altering the total mix of available information.

22.     Defendant Star Equities acted knowingly or with severe recklessness in

manipulating Plaintiffs into purchasing the securities in the Star Development Ltd. As circumstantial evidence of intent to deceive, Plaintiffs allege:

(a)     Neither Defendant Star Equities nor its principals Firer and Gelman ever accounted for monies due and owing to Plaintiffs despite repeated demands by Plaintiffs;

(b)     Neither Defendant Star Equities nor its principals Firer and Gelman ever disclosed the true sums of their capital contributions into Star Development Ltd;

(c)     Neither Defendant Star Equities nor its principals Firer and Gelman ever disclosed that they could not lawfully sell non-exempt securities of Star Development Ltd to Plaintiffs without prior registration;

(d)     On July 13, 2020 Defendant Gelman came to see in person Plaintiff Goldstein purportedly "to smooth things over" on behalf of himself, Firer, and other Defendants. However, when confronted by Mr. Goldstein about the amount of capital contributions as reflected on Exhibit 1, and about the purchase price of the Project Boeuf realty, Gelman initially lied by stating that that Parc a Boeuf a/k/a Grooms Beach parcel was purchased for $3.8 million, and only after being pressed by facts reluctantly admitted that neither he nor Gelman placed any monies as capital contributions into Star Development Ltd or towards the purchase of above-mentioned realty.

23.     On December 5, 2017, at the time and place as more specifically alleged above, Plaintiffs justifiably relied on Defendants' misrepresentations and omissions concerning the securities, taking in consideration:

- Plaintiffs' relative unsophistication in matters involving securities;

- Existence of a long-term business and personal relationship between Mr. Goldstein and Defendants Firer and Gelman and the fact that Defendant

Firer was at the time the corporate Secretary of Pinnacle Three Corporation;

- Plaintiffs' lack of independent access to information concerning Defendants Gelman and Firer's capital contributions into the Star Development Ltd, and omissions concerning non-exempt status of the unregistered securities;

- Defendant Star Equities owed a fiduciary duty to Plaintiffs by virtue of membership in the Star Development Ltd;

- Defendants concealed the misrepresentations and/or omissions regarding capital contributions and/or regarding the fact that Plaintiffs are purchasing securities which must have been registered with the Securities and Exchange Commission, but in fact were not; and

- Defendants were the ones who initiated the sale of securities in Star Development Ltd transactions and/or sought to expedite them.

24.     As a proximate result of Defendant Star Equities' deception and/or manipulation in connection with the purchase and sale of securities, Plaintiff Pinnacle Three Corporation with Mr. Goldstein  as nominee purchased $840,000.00 worth of unregistered non-exempt securities in Star Development Ltd, and thereby suffered economic losses.

25.     Defendant Star Equities' deception and/or manipulation in connection with the purchase and sale of securities was proximately responsible for Plaintiffs' loss, because: (a) at the time of sale it was illegal for Defendants to sell unregistered non-exempt securities, and since at the time of each sale there was no market for unregistered non-exempt securities, their market value was zero, or next to nothing; and/or (b) Plaintiffs' 20% interest was substantially diluted due to capitalization of only $1,684,000.00 as reflected on Exhibit 2; and/or (c) Plaintiff's 20% interest was never recorded in the corporate registry of Star Development Ltd and no shares certificate was

ever issued to Plaintiffs.

### COUNT II: LIABILITY OF CONTROLLING PERSONS 15 USC § 78t
### [STAR EQUITIES, GELMAN, FIRER]

26.     Plaintiffs restate the allegations in paragraphs 1 through 14 entirely.

27.     Defendant Star Equities committed a primary violation of the Exchange Act of 1934 as more specifically alleged in Count I.

28.     Defendants Firer and Gelman by virtue of being managers of the Star Equities, and by virtue of the fact that Defendants Firer and Gelman had sole control over Star Equities and its company policies, and Defendants Firer and Gelman had the power to control the general business affairs of Star Equities, and had the power to directly control or influence the specific company policies that created the scheme and/or that resulted in the sale of securities to Plaintiffs as alleged above.

29.     Defendants Firer and Gelman had control over all essential aspects of the statements made in the Star Development Ltd Operating Agreement, Exhibit 1, including those misrepresenting the capital contributions by Defendants Gelman and Firer into the Star Development Ltd.

30.     Defendants Firer and Gelman had sole control over the bank accounts of Star Equities, which received funds that Plaintiff Goldstein gave in-hand to Gelman and written from the account of Pinnacle Three Corporation, in connection with the sales and purchases of the securities in Star Development Ltd.

31.     As a direct and proximate result of Defendants' deception and/or manipulation in connection with the purchase and sale of securities in the Star Development Ltd, Plaintiffs Pinnacle Three Corporation and Goldstein as its nominee purchased $840,000.00 worth of unregistered securities and suffered economic losses in the amount to be proven at trial.

**COUNT III: VIOLATION OF THE FLORIDA'S SECURITIES INVESTOR
PROTECTION ACT FLA. STAT. §§ 517.011 *ET SEQ.*
[AS AGAINST ALL DEFENDANTS]**

32.    Plaintiffs restate the allegations in paragraphs 1 through 15, 17, 19 through 25, and

28 through 30 entirely.

33.    Defendants acted at least negligently in manipulating Plaintiffs into purchasing

securities in the Star Development Ltd.

34.    Any agent of seller which has personally participated in sale of security is liable for

FSIPA violations, whether agent is corporation, partnership, or natural person. Defendants Star

Equities, Gelman, and Firer, as persons directors, officers, partners, or agents of the Star

Development Ltd, are jointly and severally liable to Plaintiffs.

**COUNT IV: VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR
TRADE PRACTICES ACT, FLA. STAT. § 501.203 *ET SEQ.*
[AS AGAINST ALL DEFENDANTS]**

35.    Plaintiffs restate the allegations in paragraphs 1 through 15 entirely.

36.    This claim is for violation of Chapter 501, part II of the Florida Statutes, known as

the Florida Deceptive and Unfair Trade Practices Act, §§ 501.203 *et seq*. ("FDUTPA").

37.    Defendants engaged in a deceptive or unfair act or practice in the conduct of their

trade or commerce.  Defendants' practices in selling units and/or shares of ownership in the Star

Development Ltd, as alleged in paragraphs 1, 9–14,  were deceptive since they were likely to

mislead a person or entity, acting reasonably in the circumstances, to such person or entity's

detriment, and Plaintiffs were so misled to their detriment. Plaintiffs and Defendants, each in its

own way, were engaged in a consumer-type activity of purchasing and selling the securities in Star

Development Ltd.

38.    Alternatively, Defendants engaged in selling units of ownership in the Star

Development Ltd, as alleged in paragraphs 1, 9–14, that were "unfair," since they offend the established public policy and were immoral, unethical, oppressive, unscrupulous, or substantially injurious.

       (a)    Defendants' acts produced a substantial injury to Plaintiffs that is measured in the hundreds of thousands of dollars.

       (b)    The "benefit" of Defendants' practices, in selling unregistered securities and engaging in acts that constitute a violation of Rule 10b-5, do not outweigh the severity of Plaintiffs' economic injury, which was not of a kind that Plaintiffs could have reasonably avoided.

39.    Alternatively, Defendants' violations of the Exchange Act of 1934 and of the Florida's Securities Investor Protection Act, as more specifically alleged in the preceding counts, operate as an implied FDUTPA predicate.

40.    As a result of Defendants' deceptive acts and/or unfair practices, Plaintiffs were financially injured; specifically, Plaintiffs' actual damages are the amounts of consideration that Defendants obtained from Plaintiffs.

## COUNT V: FRAUDULENT MISREPRESENTATION
### [AS TO ALL DEFENDANTS]

41.    Plaintiffs restate the allegations in paragraphs 1 through 15 entirely.

42.    Defendants made  false statements concerning a material fact, specifically: (a) Defendants misrepresented in the Exhibit 1 the amounts of Defendants Firer and Gelman's capital contributions into the Star Development Ltd and/or misattributed other investors' capital contributions as their own, (b) misrepresented the total amount of capital contributed, and (c) that the land parcel intended to be purchased did not cost $4,200,000.00 but rather $1,450,000.00.

43.    Defendants knew the statements were false when they made them.

44.    Defendants intended that Plaintiffs would rely on these false statements so that

Plaintiffs would invest money into Star Development Ltd believing that Gelman, Firer, and Star Equities have personal investment in the undertaking, or "skin in the game," and believing that the value of the purchased interest is $4,200,000.00 as was represented.

45.     Plaintiffs reasonably relied on Defendants' false statements, since the falsity could have not been discovered by Plaintiffs, because the knowledge about misrepresentations was in Defendants' sole possession and/or control.

46.     The false statements were a legal cause of Plaintiffs' financial losses.

**WHEREFORE**, Plaintiffs respectfully requests the Honorable Court as follows:

(a)     Rescind the operating agreement signed by Leon Goldstein as nominee for Pinnacle Three Corporation and order the return of $840,000.00 paid by Pinnacle Three Corporation as consideration, together with prejudgment interest on same amount;

(b)     Award Plaintiffs actual damages arising out of purchase and sale of units and/or shares in Star Development Ltd, in the amount to be proven at trial but no less than $840,000.00, together with prejudgment interest;

(c)     Award Plaintiffs such additional damages, over and above the amount of their actual damages, that are authorized and warranted by law;

(d)     Award Plaintiffs court costs and attorney's fees pursuant to Fla. Stat. §§ 517.211, and 521.2105; and

(e)     Award such other relief as this Court deems just and appropriate.

Respectfully submitted,                              By:     _/s/ Sergiu Gherman_
                                                                  Sergiu Gherman, Bar No. 37031
                                                                  sgherman@ghermanlaw.com
                                                                  Gherman Legal Pllc
                                                                  25 SE 2nd Ave. Ste. 808
                                                                  Miami FL 33131-1603

                                                                  Attorney for Plaintiffs

# EXHIBIT 1

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT
# FOR
# STAR DEVELOPMENT LIMITED
# A LIMITED LIABILITY COMPANY

## ARTICLE I
## Company Formation

1.1 **FORMATION.** The Members have formed a Limited Liability Company ("**Company**") according to the Companies Act Cap. 58A of the Continuous Revised Edition of the laws of Grenada. This operating agreement is entered into and effective as of the date it is adopted by the members.

1.2 **REGISTERED AGENT.** The name and location of the Company's registered agent will be stated in the company's formation documents.

1.3 **TERM.** The Company will continue perpetually unless,

    (a) Members whose capital interest as defined in Article 2.2 exceeds 50 percent vote for dissolution; or

    (b) Any event which causes the Company's business to become unlawful; or

    (c) The death, resignation, expulsion, bankruptcy, retirement of a Member or the occurrence of any other event that terminates the continued membership of a Member of the Company; or

    (d) Any other event causing dissolution of the Company under applicable state laws.

1.4 **CONTINUANCE OF COMPANY.** In the event of an occurrence described in ARTICLE 1.3(c), if there are at least two remaining Members, those Members have the right to continue the business of the Company. This right can be exercised only by the unanimous vote of the remaining Members within ninety (90) days after the occurrence of an event described in ARTICLE 1.3(c). If not exercised, the right of the Members to continue the business of the Company will expire.

1.5 **BUSINESS PURPOSE.** The Company will conduct any lawful business deemed appropriate in carrying out the company's objectives.

1.6 **PRINCIPAL PLACE OF BUSINESS.** The Company's principal place of business will be stated in the formation documents, or as selected by the Managers.

1.7 **THE MEMBERS.** The name and residential address of each member are listed in Exhibit II attached to this Agreement.

1.8 **ADMINISSION OF ADDITIONAL MEMBERS.** Additional members may only be admitted to the Company through a Certificate of New Membership issuance by the company of new interest in the Company or as otherwise provided in this agreement.

## ARTICLE II
## Capital Contributions

2.1 **INITIAL CONTIBUTIONS.** The Members will initially contribute capital to the Company, as described in Exhibit 3 attached to this Agreement. The agreed total value of such property and cash is <u>Four Million Two Hundred Thousand and 00/100</u> dollars ($4,200,000.00).

2.2 **ADDITIONAL CONTRIBUTIONS.** Except as provided in ARTICLE 6.2, no Member will be obligated to make any additional contribution to the Company's capital.

2.3 **RIGHT OF FIRST OFFER.** Each time the Company proposes to offer any additional Units of the Company, the Company shall offer such Units to all Members which are accredited investors (as such term is defined in Regulation D of the Securities Act) (each a **"Qualified Member"**) in accordance with the provisions of this Section 2.3. The Company shall deliver a notice (**"ROFO Notice"**) to each Qualified Member stating (i) its bona fide intention to offer such Units, (ii) the number of such Units to be offered and (iii) the price and terms upon which it proposes to offer such Units. By written notice received by the Company within ten days after the receipt of the ROFO Notice, each Qualified Member may elect to purchase, at the price and on the terms specified in the ROFO Notice, up to that number of such Units reflecting such Qualified Member's Pro Rata share of the total Class A Percentage Interest. Any Qualified Member exercising its rights under this Section 8.06 shall execute and deliver such customary documents as the Company may reasonably request as a condition to such issuance, and pay for such securities at closing in immediately available funds. If all Units that Qualified Members are entitled to purchase pursuant to this Section 2.3 are not purchased as provided herein, the Company may, during the 180-day period following the expiration of the exercise period provided in this Section 2.3, offer the remaining unsubscribed portion of such Units to any Person or Persons at a price not less than that, and upon terms no more favorable to the offeree than those, specified in the ROFO Notice. If the Company does not enter into and close an agreement for the sale of the Units within such period, the right provided hereunder shall be deemed to be revived and such Units shall not be offered unless first reoffered to the Qualified Members in accordance herewith.

## ARTICLE III
## Profits, Losses and Distributions

3.1 **PROFITS/LOSSES.** For financial accounting and tax purposes, the Company's net profits or net losses will be determined on an annual basis. These profits and losses will be allocated to the Members in proportion to each Member's capital interest in the Company as set forth in Exhibit II as amended and in accordance with Treasury Regulation 1.704-1.

3.2 **DISTRIBUTIONS.** The Members will determine and distribute available funds annually or as they see fit. **"Available funds"** refers to the net cash of the Company available after expenses and liabilities are paid. Upon liquidation of the Company or liquidation of a

Member's interest, distributions will be made in accordance with the positive capital account balances or pursuant to Treasury Regulation 1.704-l(b)(2)(ii)(b) (2). To the extent a Member has a negative capital account balance, there will be a qualified income offset, as set forth in Treasury Regulation 1.704-l(b)(2)(ii)(d).

## ARTICLE IV
## Management

4.1   **MANAGEMENT OF THE BUSINESS.** The Members holding a majority of the capital interests in the Company, as set forth in Exhibit II as amended, may vote to elect a Manager or Managers. One manager will be elected by the Members as Chief Executive Manager. The Manager(s) may be a Member or Non-Member. The name and residential address of each Manager is attached as Exhibit 1 of this Agreement.

4.2   **MEMBERS.** The liability of the Members will be limited according to state law. Members that are not Managers will take no part in the control, management, direction, or operation of the Company's affairs and will have no power to bind the Company in legal agreements. The Managers may seek advice from the Members, but need not follow such advice. No Member is an agent of any other Member of the Company, solely by reason of being a Member.

4.3   **POWERS OF MANAGERS.** The Managers are authorized on the Company's behalf to make all decisions as to (a) the sale, development, lease or other disposition of the Company's assets; (b) the purchase or other acquisition of other assets; (c) the management of all or any part of the Company's assets; (d) the borrowing of money and the granting of security interests in the Company's assets; (e) the pre-payment, refinancing or extension of any loan affecting the Company's assets; (f) the compromise or release of any of the Company's claims or debts; and, (g) the employment of persons, firms or corporations for the operation and management of the company's business.

The Managers are further authorized to execute and deliver (a) all contracts, conveyances, assignments leases, sub-leases, franchise agreements, licensing agreements, management contracts and maintenance contracts covering or affecting the Company's assets; (b) all checks, drafts and other orders for the payment of the Company's funds; (c) all promissory notes, loans, security agreements and other similar documents; and, (d) all other instruments of any other kind relating to the Company's affairs.

4.4   **CHIEF EXECUTIVE MANAGER.** The Chief Executive Manager has primary responsibility for managing the operations of the Company and for carrying out the decisions of the Managers.

4.5   **NOMINEE.** Title to the Company's assets must be held in the Company's name or in the name of any nominee that the Managers may designate. The Managers have power to enter into a nominee agreement with any such person, and such agreement may contain provisions indemnifying the nominee, except for his or her willful misconduct.

4.6     **COMPANY INFORMATION.** The Managers must supply information regarding the company or its activities to any member upon his or her request. Any Member or their authorized representative will have access to and may inspect and copy all books, records and materials in the Manager's possession regarding the Company or its activities. Access and inspection of information will be at the requesting Member's expense.

4.7     **EXCULPATION.** Any act or omission of the Managers, the effect of which may cause or result in loss or damage to the Company or the Members, if done in good faith to promote the best interests of the Company, will not subject the Managers to any liability.

4.8     **INDEMNIFICATION.** The Company will indemnify any person who was or is a party defendant or is threatened to be made a party defendant, in a pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that the person is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, for instant expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Members determine that the person acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, does not in itself create a presumption that the person did or did not act in good faith and in a manner which he or she reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was lawful.

4.9     **RECORDS.** The Managers must keep the following at the company's principal place of business or other location:

   (a) A current list of the full name and the last known street address of each Member;
   (b) A copy of the Company's Certificate of Formation and Operating Agreement and all amendments;
   (c) Copies of Company's income tax returns and reports, if any, for the three most recent years;
   (d) Copies of the Company's financial statements for the three most recent years, if any.

## ARTICLE V
## Compensation

5.1     **MANAGEMENT FEE.** Any Manager rendering services to the Company is entitled to compensation if approved by the majority vote of the Members of the Company.

5.2     **REIMBURSEMENT.** The Company must reimburse the Managers or Members for all direct out-of-pocket expenses incurred by them in managing the Company. Such expenses shall be pre-approved by the majority vote of the Members of the Company prior to incurring such expenses.

## ARTICLE VI
### Bookkeeping

6.1     **BOOKS**. The Managers will maintain a complete and accurate accounting of the Company's affairs at the Company's principal place of business. The managers may select the method of accounting and the company's accounting period will be the calendar year.

6.2     **MEMBER'S ACCOUNTS**. The Managers must maintain separate capital and distribution accounts for each member. Each member's capital account will be determined and maintained in the manner set forth in Treasury Regulation 1.704-l(b)(2)(iv) and will consist of his or her initial capital contribution increased by:

(a) Any additional capital contribution made by the member;
(b) Credit balances transferred from the member's distribution account to his or her capital account;

And decreased by:

i.   Distribution to the member in reduction of Company capital;
ii.  The Member's share of Company losses if charged to his or her capital account.

6.3     **REPORTS**. The Managers will close the books of account after the close of each calendar year and will prepare and send to each member, a statement of such Member's distributive share of income and expense for income tax reporting purposes.

## ARTICLE VII
### Transfers

7.1     **BOOKS**. The Managers will maintain a complete and accurate accounting of the Company's affairs at the Company's principal place of business. The managers may select the method of accounting and the company's accounting period will be the calendar year.

## ARTICLE VIII
### Dissolutions

8.1     **DISSOLUTION**. The Member(s) may dissolve the company at any time. The Member may NOT dissolve the company for a loss of membership interests. Upon dissolution the company must pay its debts first before distributing cash, assets, and/or initial capital to the Member or the Members interests. The dissolution may only be ordered by the Member(s), not by the owner of the Members interests.

## CERTIFICATION OF MEMBER

The undersigned hereby agree, acknowledge, and certify that the foregoing operating agreement is adopted and approved by each member, the agreement consisting of ___ pages, constitutes, together with Exhibit I, Exhibit II and Exhibit III (if any), the Operating Agreement of _____, adopted by the members as of _____, _____ 20___.

**Members:**

| Oleg Khomenko | | Twenty (20%) |
|---|---|---|
| Printed Name | Signature | Percent |

| Oleg Firer | | Twenty (20%) |
|---|---|---|
| Printed Name | Signature | Percent |

| Roman Khomenko | | Twenty (20%) |
|---|---|---|
| Printed Name | Signature | Percent |

| Gary Gelman | | Twenty (20%) |
|---|---|---|
| Printed Name | Signature | Percent |

| Leon Goldstein | | Twenty (20%) |
|---|---|---|
| Printed Name | Signature | Percent |

## EXHIBIT I

### LIMITED LIABILITY COMPANY OPERATING AGREEMENT
### FOR
### STAR DEVELOPMENT LIMITED

### LISTING OF MANAGERS

By a majority vote of the Members the following Managers were elected to operate the Company pursuant to ARTICLE IV of the Agreement:

| Oleg Khomenko | | Oleg Firer | |
|---|---|---|---|
| Printed Name | | Printed Name | |
| Chief Executive Manager | | Manager | |
| | Address | 3265 NE 167th Street | Address |
| | | North Miami Beach, FL 33160 | |

The above listed Manager(s) will serve in their capacities until they are removed for any reason by a majority vote of the Members as defined by ARTICLE IV or upon their voluntary resignation.

Signed and Agreed this ___ day of _____, 20___.

Oleg Khomenko
Printed Name                              Signature

Oleg Firer
Printed Name                              Signature

Roman Khomenko
Printed Name                              Signature

Gary Gelman
Printed Name                              Signature

Leon Goldstein
Printed Name                              Signature

## EXHIBIT II

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
### FOR
### STAR DEVELOPMENT LIMITED

## LISTING OF MEMBERS

As of the ___ day of _____, 20___ the following is a list of Members of the Company:

| Oleg Khomenko | | Twenty (20%) |
| Printed Name | Signature | Percent |

| Oleg Firer | | Twenty (20%) |
| Printed Name | Signature | Percent |

| Roman Khomenko | | Twenty (20%) |
| Printed Name | Signature | Percent |

| Gary Gelman | | Twenty (20%) |
| Printed Name | Signature | Percent |

| Leon Goldstein | | Twenty (20%) |
| Printed Name | Signature | Percent |

Authorized by Member(s) to provide Member Listing as of this ___ day of _____, 20___.

| | | |
| Signature of Member | Signature of Member | Signature of Member |

| | |
| Signature of Member | Signature of Member |

Page 8

## EXHIBIT II

### LIMITED LIABILITY COMPANY OPERATING AGREEMENT
### FOR
### STAR DEVELOPMENT LIMITED

### LISTING OF MEMBERS

Pursuant to ARTICLE II, the Members' initial contribution to the Company capital is stated to be Four Million Two Hundred Thousand and 00/100 dollars ($4,200,000.00). The description and each individual portion of this initial contribution is as follows:

| | |
|---|---|
| Oleg Khomenko | $ 840,000.00 |
| Oleg Firer | $ 840,000.00 |
| Roman Khomenko | $ 840,000.00 |
| Gary Gelman | $ 840,000.00 |
| Leon Goldstein | $ 840,000.00 |
| **TOTAL:** | $ **4,200,000.00** |

SIGNED AND AGREED this ___ day of _____, 20___.

_____     _____     _____
Signature of Member          Signature of Member          Signature of Member

_____     _____
Signature of Member          Signature of Member



# EXHIBIT 2

## EXHIBIT II

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
### FOR
### STAR DEVELOPMENT LIMITED

## LISTING OF MEMBERS

Pursuant to ARTICLE II, the Members' initial contribution to the Company capital is stated to be One Million Six Hundred Eighty-Four Thousand and 00/100 dollars ($1,684,000.00). The description and each individual portion of this initial contribution is as follows:

| | |
|---|---|
| Star Equities, LLC ("**Preferred Member**") for the Series A Preferred Capital | $ 840,000.00 |
| Oleg Firer | $ 1,000.00 |
| Gary Gelman | $ 1,000.00 |
| Oleg Khomenko | $ 1,000.00 |
| Roman Khomenko | $ 1,000.00 |
| Leon Goldstein | $ 840,000.00 |
| **TOTAL:** | $ **1,684,000.00** |

SIGNED AND AGREED this ___ day of ___, 20___

_____
Signature of Member

_____
Signature of Member

_____
Signature of Member

_____
Signature of Member

_____
Signature of Member

_____
Signature of Preferred Member